## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**DEBRA WOOD,**

        **Plaintiff,**

**v.**                                       **Case No. 8:06-cv-687-T-27TBM**

**CELLCO PARTNERSHIP,**
**d/b/a VERIZON WIRELESS,**

        **Defendant.**

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the court on referral by the Honorable James D. Whittemore for a Report and Recommendation on **Defendant's Motion for Summary Judgment** (Doc. 23).  By its motion, Defendant seeks the entry of summary judgment on all claims.  In general, Defendant argues that Plaintiff's accusations of gender and age discrimination are baseless, as the record indisputably establishes that older and female employees received fair and often favorable treatment during the pertinent period; many remain employed by Defendant and have been and are recognized, praised, and promoted even after the account realignment that is central to Plaintiff's complaint; and the account realignment was part of a larger business realignment undertaken without any discriminatory animus.  In support, Defendant submits an incorporated Memorandum of Law (Doc. 23 at 3-25), a Statement of Undisputed Facts (Doc. 22), discovery materials (Doc. 23-3 through 23-

6), and an affidavit and depositions (Docs. 24-37).[1]  Plaintiff filed a response in opposition

(Doc. 44) and supporting exhibits (Docs. 45, 47-48).  Plaintiff maintains that she was exposed

to gender and age discrimination over the full term of her employment.  She complained about

it on her own behalf and on behalf of others, and ultimately, she was caused to suffer the loss

of her most lucrative account by reason of her complaints.  She contends that because she

spoke out, Defendant retaliated against her, and ultimately, the conditions of her employment

became so bad that she was constructively discharged.[2]  The court heard oral arguments on

September 20, 2007.  *See* (Doc. 58).


I.

While the parties thoroughly dispute whether Plaintiff suffered any form of

discrimination or retaliation, there are a number of salient, undisputed facts.  Plaintiff Debra

Wood was born on June 23, 1950, and is a person over forty years of age at all pertinent times.

Plaintiff was hired on July 10, 2000, by Defendant Cellco Partnership d/b/a Verizon Wireless

("Defendant" or "Verizon") as a Business Account Executive ("BAE") salesperson to sell

---

[1]Defendant has filed a Motion for Permission to File a Brief Reply to Plaintiff's
Memorandum Opposing Defendant's Motion for Summary Judgment (Doc. 49), to which
Plaintiff filed a response in opposition (Doc. 50).  Upon consideration, the motion is
**DENIED**.

[2]In its motion and at arguments, Defendant anticipates broader arguments which
Plaintiff "might" make in support of her discrimination and retaliation claims than are actually
revealed by the Plaintiff's response.  By her response, Plaintiff centers her claims on
Defendant's reassignment of her most lucrative account, the Nielsen Media Research
account, and her alleged constructive discharged prompted by that action.  Plaintiff does not
address the Defendant's other, anticipated bases for her claims.  Accordingly, this Report and
Recommendation will address the issues as framed by Plaintiff's response.

2

Verizon wireless telephone services.  Prior to this employment, Plaintiff worked for eight years selling wireless services for AT&T.

Initially, Plaintiff's account territory was South Pinellas County.  Plaintiff took over the Nielsen Media Research ("Nielsen") account in North Pinellas County in August 2000 and was permitted to keep it even after the BAE for that territory returned from medical leave. Plaintiff's immediate supervisor was James B. Young, a Business Sales Manager ("BSM").[3] By Plaintiff's account, in order to get away from a territory she felt Sandra Chevola controlled and because of relationships she had developed in the Sarasota area, in or about early 2001, she asked Young for a transfer to the Sarasota-Manatee County territory.  There, she shared the territory with two male BAEs, Russ Cuccia and Robert Melio.  She continued to service the Nielsen account.  Plaintiff alleges that Young treated Cuccia and Melio more favorably and permitted them to invade her sales area.  Similarly, she maintains that during this period, Young assigned to another male, Soto Passias, two accounts within her territory on which Marianne Locasio, a Major Account Manager ("MAM") in South Florida, needed assistance. Plaintiff first brought her complaints about this treatment to HR Director Handley in April

---

[3]In addition to Mr. Young, the following individuals (except for Jack Plating) are mentioned in connection with Plaintiff's claims.  The Director of Business to Business Sales for the Florida Region ("B2B Director") at the time of Plaintiff's hiring was Colleen Chappell, who was replaced by Andrea Orr-Lynch.  The B2B Director reported to a Regional President of the Florida Region (Michael Lanman), who in turn reported to the President of the South Area (Jack Plating).  Michelle Marlowe was the first National Account Manager ("NAM") near the end of 2001, and since Nielsen was a national account, Plaintiff reported both to Young and to Marlowe.  Jim Handley became Associate Director of Human Resources ("HR") of Verizon's West Florida division in January 2002.  In February 2004, Christal O'Donoghue was hired as the first Associate Director of Strategic Accounts.  In April 2004, Ms. O'Donoghue hired Terri Fabbrini as the NAM, a position that had been vacated by Marlowe, so Plaintiff then reported to Mr. Young and Ms. Fabbrini.

3

2002. Dep. of James C. Handley (Doc. 31 at 43-44).  Defendant responds that the records

(and Plaintiff's own testimony) reveal that, at the time, Plaintiff's complaints were simply that

other BAEs were getting more favorable treatment than she was, not that she was the victim

of sex or age discrimination.  It asserts that when she did complain, the company took steps to

address her concerns.  For instance, she received 33 to 35 national account numbers to make

her whole, a resolution with which she indicated at the time she was satisfied.  By the

Defendant's account, she also to received favorable treatment in relation to the Nielsen

account.  *See* (Doc. 22) (citing Dep. of Debra Wood (Docs.  25, 26 at 291, 336); Dep. of

James B. Young (Doc. 29 at 33, 208).

By the Plaintiff's chronology of events, in 2002 she sought to make sales calls in the

Westshore area of Tampa, which was left open when the assigned sales representative left the

company.  Plaintiff claims that for a year, Mr. Young refused to allow her to do so although he

was permitting male BAEs to make such sales calls.  In or about April 2003, Mr. Young

awarded Plaintiff the Westshore territory, but two zip codes within that area, 33614 and

33634, were stripped from the territory.  In November 2003, after complaining to HR Director

Handley, she received the two zip code areas.  An email chain between Plaintiff and Mr.

Handley from early December 2003 sets forth a number of Plaintiff's complaints and

Defendant's responses to her complaints.  Therein, she complains that "I think that [Young]

discriminates against women" and that he retaliated against her "by giving [her] all residential

zips in April of 2003."  Wood Dep., Exh. 32 (Doc. 26-2 at 36-37).  Mr. Handley responded by

reminding Plaintiff that her complaints had been investigated and that he found no evidence of

discrimination against women and that the most successful members of the team were all

4

women.  *Id.* at 36.  By Defendant's account, Plaintiff nonetheless continued to complain that

other BAEs, male and female, were getting more favorable treatment for reasons other than

gender or age discrimination.[4]  It maintains that Plaintiff herself received favorable treatment in

relation to the Nielsen account, which had grown into a national account with over 1000 lines.

Such accounts were usually handled by MAMs, but Plaintiff was permitted to continue to

handle the account.

      Central to the parties' dispute are the facts surrounding Plaintiff's loss of the Nielsen

account in the fall of 2004.  The undisputed testimony of Mr. Lanman and Ms. Orr-Lynch

indicates that in late 2003 or early 2004, the decision was made to restructure Defendant's

sales force in Florida by putting a strategic sales team in place.  Mr. Lanman characterized his

decision to change the organizational structure of the Florida region as part of the company's

greater objective to improve sales through a strategic division around national accounts, i.e.,

where a NAMs and MAMs worked the national accounts.  Dep. of Michael Lanman (Doc.  34

at 25-26).  Ms. Orr-Lynch, who had worked with strategic accounts in a different region

before she became the Director of Sales for the Florida Region, suggested to Lanman that

Florida should switch to the strategic accounts structure as other regions had done, and she

implemented the transition in Florida.  *Id.* at 29-39.  Ms. Orr-Lynch hired Christal

O'Donoghue to serve as her Associate Director for Strategic Sales.  *Id.* at 31.  New company

Rules of Engagement ("ROE") were drafted and adopted to clarify the roles and types of

---

[4]In Plaintiff's memorandum, she sets forth a chart with the names of many of the
individuals pertinent to her statement of facts and allegations, along with their apparent ages
as developed by the Defendant's counsel during discovery.  *See* (Doc. 44 at 6).

5

accounts that the members of the sales force would manage under the realignment of accounts and personnel.  Wood Dep., Exh. 1 (Doc. 26-2 at 49-51).  The stated effective date of the ROE was May 1, 2004.  *Id.*

According to Ms. Orr-Lynch, under the strategic accounts plan, BAEs (such as Plaintiff) were removed from accounts with more than 300 employees.  Dep. of Andrea Orr-Lynch (Doc. 35 at 32).  Ultimately, she and her management team allowed some BAEs to retain their accounts with over 300 employees based on considerations such as the account history, the current condition of the account, satisfaction of the customer, whether any projects were still underway, and factors of that nature.  *Id.* at 53-54.

Around mid-2004, Mr. Lanman became aware that Plaintiff was opposed to the new organization and in particular did not want to lose the Nielsen account.  Lanman Dep. (Doc. 34 at 32-33).  However, from his point of view, everyone in the organization needed to conform to the new strategic structure and many people (and their accounts) would be affected by the transition.  *Id.*  By Ms. Orr-Lynch's account, the decision to transition the Nielsen account away from Plaintiff was a business decision and not a personal decision, and the accommodation to Plaintiff allowing her to continue to receive her compensation from Nielsen through the end of the year was an exception.  Orr-Lynch Dep. (Doc. 35 at 87-88).  When considering whether to allow Plaintiff to retain the Nielsen account, Mr. Lanman, Ms. Orr-Lynch, Jim Handley, and his HR assistant, Melissa Matos, considered Plaintiff's work on a data project that was underway, the failure of the project to come to fruition, and the customer's high regard for her.  *Id.* at 77-80.  Mr. Young was not involved in the decision, but he recommended that Plaintiff be allowed to stay on the account until the data project to come

to fruition so that Plaintiff could earn the rewards of her work. *Id.* at 80. Plaintiff was not taken off the Nielsen account when the ROE became effective in May 2004 because she was out on short-term disability, and they did not want to make the transition in Plaintiff's absence. *Id.* at 121-22.

As discussed below, while Plaintiff maintains that the decision to take the Nielsen account was motivated by a discriminatory animus and done in retaliation for her having defended Ms. Chevola during a company investigation of alleged wrongdoing, she does not dispute the facts of the realignment. In fact, in April 2004, Plaintiff interviewed with Ms. O'Donoghue for a MAM position under the realignment but subsequently withdrew her name because of concerns with her son's medical needs. Plaintiff maintains an additional reason was a statement made by Ms. O'Donoghue during the interview that she needed to be careful because a former employee, Sheila Huber-Smith could be hiding under her car with a bomb.[5]

Plaintiff testified that after her interview for the MAM position, Ms. O'Donoghue's secretary informed her that Ms. Huber-Smith and Mr. Young had committed fraud on the Omega Insurance account by fraudulently activating lines. She had first heard this from Marianne Locasio. Wood Dep. at 384. When she confronted Mr. Young with this accusation, he became red-faced and said, "ridiculous." Plaintiff did not consider the matter her business and did not know many specifics. *Id.* at 386-93. However, by her account, Ms. Chevola was ultimately demoted and fired for making the fraud allegations, and the investigation of Ms.

---

[5]A new NAM position became available as well. Plaintiff claims that she did not put in for the open NAM position because Mr. Young told her she could not because she could not jump two levels.

Chevola's complaints, including her complaints against Ms. O'Donoghue, are highly pertinent to Plaintiff's claims for retaliation.[6]

John Lucas, a manager in employee relations, investigated Ms. Chevola's complaints against Ms. O'Donoghue and her allegations of unfair treatment. Dep. of John Lucas (Doc. 32 at 37). He spoke with nearly twenty people including Plaintiff. *Id.* at 39. Plaintiff maintains that the day before she was to be interviewed by Mr. Lucas, Mr. Young spoke with her about the rumors going around concerning her losing the Nielsen account. He advised her that the rumors were true and that she might or might not lose the account and that Mr. Lanman and Ms. Orr-Lynch were going to make the decision. Wood Dep. at 397. She told Young she was meeting with Lucas the following morning. Plaintiff testified that she understood this conversation as Mr. Young telling her that if she kept her mouth shut (in her meeting with Lucas), she would not lose the account. *Id.* at 397-98. The following day, she spoke with Mr. Lucas via telephone, spoke favorably about Ms. Chevola, and expressed her view that Ms. Chevola was being mistreated. She also vented her own frustrations about the dysfunction in the office, the Nielson account, the lack of support from Ms. Orr-Lynch and Ms. Fabbrini, Ms. Fabbrini's lack of qualifications for her position, Ms. O'Donoghue's and Ms. Fabbrini's animosity, stalking, and face-making toward herself (and Chevola). *Id.* at 399-404. According

---

[6]It appears undisputed that in late January 2004, Ms. Chevola, who held the positions of BAE and then MAM, reported an alleged fraud on the Omega account. *See* Dep. of Sandra Chevola (Doc. 30 at 341-42). In late August 2004, Sandra Chevola raised allegations of unfair treatment by her supervisors to Compliance Guideline, a third-party administrator of employment complaints. *See* Lucas Dep. (Doc. 32 at 37). Plaintiff gave a statement in the investigation of Ms. Chevola's claims. Ms. Chevola was terminated on December 6, 2004.

to Plaintiff, she did not speak with Mr. Lucas about the allegations of fraud on the Omega account but instead spoke in opposition to how she was being treated by her supervisors. *Id.* at 395. Ms. O'Donoghue denies that she mistreated Plaintiff or Ms. Chevola in the ways claimed.

Notes taken by Mr. Lucas of the telephone conversation with Plaintiff dated September 23, 2004, indicate that she supported Ms. Chevola's complaints of mistreatment at the hands of Ms. O'Donoghue and Ms. Fabbrini, and she expressed the view that they were trying to get rid of her. *See* Lucas Dep., Exh. 1 (Doc. 32-2). To a larger extent, the notes reflect that Plaintiff used the interview to complain about her own dissatisfaction with management and the handling of the Nielsen account. *Id.* Pertinent to the Nielsen account, the notes reflect Plaintiff's comments that "Nielsen has been my heart and soul -- Mike Lanman made the decision that the account would be handed over to Terry. 'It is a strategic account.'" *Id.* at 2. The notes also reflect the statements "I liked Andrea [Orr-Lynch] up until yesterday. - I am disappointed that she did not support me with the Nielsen account. . . ." and "I want to keep Nielsen. I am thinking about leaving because of all the unprofessionalism" and "If they take Nielsen away from me, I want the compensation for having worked as a National Account Manager." *Id.* at 3-4, 7.

On October 21, 2004, Plaintiff met with Ms. Orr-Lynch and Mr. Lanman to discuss the plan to transition the Nielsen account away from Plaintiff. Plaintiff claims that shortly before the meeting, Mr. Young made to her the comment, "Those are pretty pointed shoes for an older woman." Wood Dep. (Doc. 25 at 179). According to Ms. Orr-Lynch, the decision-makers to transition this account away from Plaintiff were Mr. Lanman and herself, Mr.

Handley, and Ms. Matos. Orr-Lynch Dep. (Doc. 35 at 80). Under the transition plan, Plaintiff was allowed to receive 100% of the commissions from the corporate activations of the Nielsen account until the end of the year. E-mail from Jim Handley to John Lucas (Oct. 27, 2007, 4:38 p.m.) (Orr-Lynch Dep. (Doc. 35, Exh. 13)). Thereafter, she received 50% of the commissions on activations for January and February 2005. By this plan, she was fully transitioned off the account as of March 1, 2005. Thereafter, the Nielsen account was fully the responsibility of Mr. Christianson, as the MAM, and Ms. Fabbrini, the NAM. Orr-Lynch Dep. (Doc. 35 at 83).

Defendant maintains that Plaintiff's testimony reveals that she was well aware that she was losing the Nielsen account even before she met with Mr. Lucas in support of Ms. Chevola. As examples, Defendant references her conversation with Mr. Young the day before the interview; the notes from Mr. Lucas's interview; Plaintiff's acknowledgment that her loss of the Nielsen account was the topic of talk by others at a meeting at Hunter's Green on or about September 16-17, 2004; and an attachment to a letter she sent Mr. Lucas after the interview that appears to reference a prior conversation with Mr. Young at which he suggested Mr. Lanman wanted her off the account also. Thus, it concludes that the taking of the Nielsen account could not have been in retaliation of Plaintiff's support for Chevola.

It is clear that, even before she gave a statement to Mr. Lucas, Plaintiff knew of the realignment plan that would result in her loss of the Nielsen account. However, the formal notice to her of how this would be accomplished was not made clear until the October 21, 2004, meeting.

10

Apart the chronological facts, Plaintiff cites to her overall high performance evaluations. *See* Wood Dep., Exh. 4 (Doc. 24-2). She testified that Ms. O'Donoghue harassed her by making mean faces at her, and sending a nasty email to her telling her to stop sending her emails about accounts, and threatening to take her accounts.[7] *See id.* (Doc. 26 at 403-05; Doc. 27 at 511-12). Plaintiff also testified that Mr. Lanman made a statement when Colleen Chappel left that "we really need some young fresh blood around here now that Colleen is gone." *Id.* at 573-74. Plaintiff also relies on testimony by Ms. Chevola that both O'Donoghue and Ms. Fabbrini made faces at Plaintiff. Chevola Dep. (Doc. 30 at 357-58, 393).

Plaintiff resigned on March 11, 2005.[8]

_____

[7]Ms. O'Donoghue denies these allegations and emphasizes that Plaintiff did not report directly to her. *See* Dep. of Christal O'Donoghue (Doc. 33 at 94).

[8]At her deposition, Plaintiff stated a number of reasons for her resignation. Her primary complaint was the loss of the Nielsen account. She complains that other BAEs were allowed to retain their major accounts and some national accounts, but she was not. Other sales people received "ramp-ups," while she "got nothing." She felt that her reputation was damaged by the failure of Mr. Lanman or Ms. Orr-Lynch to explain to Nielsen why she was taken off of the account. Plaintiff expressed her concern that people in her community would wonder why she lost the account. Plaintiff also felt that Mr. Lanman had lied to her about alignment of the B2B channel in Florida with the rest of the United States. Wood Dep. (Doc. 27 at 603-06).

Aside from the loss of the Nielsen account, Plaintiff complained generally that men received more leads than women. Plaintiff also had complains of mistreatment by Ms. O'Donaghue, who Plaintiff claims harassed her in the hallway, told her team members not to speak to her, and made faces at her.

Plaintiff believes that Mr. Young and Ms. Orr-Lynch were disrespectful to her at the meeting in October 2004. According to Plaintiff, Mr. Young made it clear that Plaintiff was an older woman, and Ms. Orr-Lynch pointed at her and threatened, "And if I hear one negative comment from you, I will fire you on the spot."

Finally, Plaintiff had complained to HR repeatedly about the unfair treatment, but she felt that HR failed to respond to her complaints, leaving her with nowhere to go. Pltf's memo. (Doc. 44 at 11-12) (citing Wood Dep. (Doc. 27 at 599, 603-06)).

11

II.

The court shall grant summary judgment for the moving party only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court may look to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," in determining whether summary judgment is appropriate. Fed. R. Civ. P. 56(c). The movant bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact. *Celotex*, 477 U.S. at 324; *Howard v. BP Oil Co.,* 32 F.3d 520, 524 (11th Cir. 1994). The non-movant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception. *Perkins v. School Bd. of Pinellas County*, 902 F. Supp. 1503 (M.D. Fla. 1995). It must set forth, by affidavit or other appropriate means, specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e).

When deciding a motion for summary judgment, "[i]t is not part of the court's function . . . to decide issues of material fact, but rather determine whether such issues exist to be tried . . ." and "[t]he court must avoid weighing conflicting evidence or making credibility determinations." *Hairston*, 9 F.3d at 919 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)). The only determination for the court in a summary judgment proceeding is whether there exists genuine and material issues of fact to be tried. *Hairston*, 9 F.3d at 921; *see also*

12

*Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997).   All the

evidence and inferences from the underlying facts must be viewed in the light most favorable to

the nonmoving party.   *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997).

## III.

## A.

Defendant first argues that Plaintiff's claims of gender and age discrimination are

without merit.   Defendant contends that Plaintiff cannot establish a *prima facie* case of

discrimination, and even if she can, she cannot establish that the business decision to take the

Nielsen account from her was motivated by discriminatory animus.   In particular, Defendant

argues that Plaintiff cannot meet her burden because she cannot demonstrate that she was

treated less fairly than others similarly situated and that, as a matter of law, she cannot establish

that she suffered an adverse employment action by reason of the transition of the Nielsen

account away from her or through her alleged constructive discharge.

Title VII prohibits employers from discriminating "against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a).   In a Title

VII discrimination case, a plaintiff may establish a *prima facie* case of discrimination through

direct or circumstantial evidence.   *See Bush v. Barnett Bank of Pinellas County*, 916 F. Supp.

1244, 1251-52 (M.D. Fla. 1996).   Here, Plaintiff relies on circumstantial evidence.   To establish

a *prima facie* case of race discrimination through circumstantial evidence, Plaintiff must show

(1) she is a member of a group protected by Title VII; (2) she was qualified for her position; (3)

she suffered an adverse effect on her employment; and (4) her employer treated her less favorably than similarly situated employees of a different gender. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Alexander v. Fulton County, Ga.*, 207 F.3d1303, 1335 (11th Cir. 2000); *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1310 (11th Cir. 1998). Plaintiff needs only to establish facts adequate to permit an inference of discrimination. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citation omitted).

Upon this showing, the burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). Upon such showing, the burden of production then shifts back to the Plaintiff to show that Defendant's proffered reason for the discharge was merely a pretext for discrimination. *Burdine*, 450 U.S. at 256. The plaintiff may prove intentional discrimination by showing that the employer's proffered reason is unworthy of credence, and the trier of fact may consider evidence establishing the plaintiff's *prima facie* case and inferences drawn therefrom on the issue of whether the defendant's explanation is pretextual. *Reeves, v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 511; *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255, n.10 (1987). "[A] plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of face as to the truth of each of the employer's proffered reasons for its challenged actions." *Latham v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) (quoting *Combs*, 106 F.3d at 1529).

14

The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on an age discrimination claim, the plaintiff must demonstrate that age actually motivated the employer's decision. *Reeves*, 530 U.S. at 141 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). Although the *McDonnell Douglas* framework was originally applied to Title VII cases, the courts have applied the framework to age discrimination cases under the ADEA as well. *See Reeves*, 530 U.S. at 141-42; *Cofield*, 267 F.3d 1264; *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination by demonstrating that (1) she was a member of the protected class, i.e., that she was at least forty years of age, (2) she was otherwise qualified for his position, (3) she suffered an adverse employment action, and (4) she was treated less favorably than similarly situated employees not within the protected class. *Reeves*, 530 U.S. at 142 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Burdine*, 450 U.S. at 252-53; *Bogle v. Orange County Bd. of County Comm'rs*, 162 F.3d 653, 656-57 (11th Cir. 1998).

The FCRA is patterned after Title VII, and thus, Plaintiff's FCRA claims are appropriately analyzed under Title VII jurisprudence. *Bass*, 256 F.3d at 1109 n.4 (quoting *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998)); *Fla. Dep't of Community Affairs v. Bryant*, 586 So. 2d 1205, 1209 (Fla. 1991). The analysis for age-based claims under the FCRA is the same as claims under the ADEA. *Hipp v. Liberty Nat'l Life Ins.*

15

*Co.*, 252 F.3d 1208, 1229 n.31 (11th Cir. 2001); *Reynolds v. Int'l Bus. Machines Corp.*, 320 F.

Supp. 2d 1290, 1307 n.35 (M.D. Fla. 2004).

B.

Here, Defendant does not dispute that Plaintiff belongs to a protected group with

respect to both her age and gender and that she was qualified to do the job.  However,

Defendant disputes that she suffered an adverse employment action and that she was treated less

favorably than similarly situated employees not within her protected classes.

To show that she suffered an adverse employment action, Plaintiff must demonstrate

that Defendant's actions impacted the "terms, conditions, or privileges" of her job in a real and

demonstrable way." *Davis v. Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001).  More

specifically,

> [a]lthough the statute does not require proof of direct
> economic consequences in all cases, the asserted impact
> cannot be speculative and must at least have a tangible
> adverse effect on the plaintiff's employment. . . .
> [T]herefore . . . to prove adverse employment action in a
> case under Title VII's anti-discrimination clause, an
> employee must show a *serious and material* change in the
> terms, conditions, or privileges of employment.
> Moreover, the employee's subjective view of the
> significance and adversity of the employer's action is not
> controlling; the employment action must be materially
> adverse as viewed by a reasonable person in the
> circumstances.

*Id.* (emphasis in original) (citation omitted).  Conduct that falls short of an ultimate employment

decision must meet "some threshold level of substantiality."  *Gupta v. Fla. Bd. of Regents*, 212

F.3d 571, 587 (11th Cir. 2000) (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453,

1456 (11th Cir. 1998)).  [N]ot everything that makes an employee unhappy is an actionable

16

adverse action." *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)

(quoting *Bass v. B.O.C.C. of Orange County, Fla.*, 256 F.3d 1095, 1118 (11th Cir. 2001)).

Even if the employment actions complained of by Plaintiff do not rise individually to the level of

an adverse employment action, the court should consider the employment actions collectively

and determine whether the total weight of the actions constitute an adverse employment action.

*Akins v. Fulton County, Ga.*, 420 F.3d 1293 (11th Cir. 2005).

Defendant argues that Plaintiff challenges "nearly every employment decision made by

[Verizon] during her five years of employment." (Doc. 23 at 1). Indeed, in her EEOC Charge

of Discrimination, Plaintiff's Answers to Defendant's First Set of Interrogatories, and

memorandum in opposition to Defendant's motion for summary judgment, Plaintiff sets out a

cast of characters and chronology detailing factual allegations that Plaintiff contends are

material to her claims. *See* (Doc. 4-1; Doc. 24, Exh. 1; Doc. 44). However, Plaintiff has

clarified that her claim centers on Defendant's decision to take away her most important and

lucrative account, Nielsen, on October 21, 2004. By Plaintiff's estimation, the Nielsen account

comprised 70% of her commission income, and therefore, the loss of the account constituted a

serious and material change in the terms and conditions of her employment.

Defendant urges nonetheless that the transition plan afforded Plaintiff an exceptional

amount of time to develop new business to offset the loss of Nielsen while at the same time she

was paid 100% of Nielsen commissions from October through December 2004, and 50% of the

commissions in January and February 2005. By Defendant's argument, the transition plan gave

Plaintiff the opportunity to avoid any significant or material impact from the loss of this account.

Defendant maintains that Plaintiff failed to "get past" the Nielsen transition and failed to

maintain a "healthy . . . sales funnel," *see* (Doc. 23 at 9-10; Doc. 29 at 156-57), and such failures on her part do not amount to an adverse employment action by Verizon.

On this motion, the court does not make factual determinations such as whether Plaintiff focused too much of her efforts on the Nielsen account and failed to capitalize on other business opportunities within her territory. As Defendant concedes, the Nielsen account was an important account that provided much of Plaintiff's commission income prior to the transition. In a light favorable to the Plaintiff, she had developed the account into a national account and had a personal stake in its success. Further, after the transition, the role of the BAEs was redefined and would prevent Plaintiff from handling of such larger accounts. Under these circumstances, I find that a reasonable person could view the reassignment of the Nielsen account as a materially adverse employment action.

Plaintiff also contends that she was constructively discharged.

> The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it has formally discharged the aggrieved employee.

*Young v. Southwestern Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975), *quoted in Buckley v. Hosp. Corp. of Am., Inc.*, 758 F.2d 1525 (11th Cir. 1985)). To establish a constructive discharge claim, the plaintiff must demonstrate that her working conditions were "so difficult . . . that a reasonable person would have felt compelled to resign." *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001) (quoting *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir. 1991); *Wardell v. Sch. Bd. of Palm Beach County,*

18

*Fla.*, 786 F.2d 1554, 1557 (11th Cir. 1986)).   In determining whether a reasonable employee would feel compelled to resign, the court must consider the specific facts of each case.   Factors such as the following are relevant to this determination:   (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; (7) offers of early retirement which include terms that are disadvantageous to the employee whether the offer is accepted or not.   *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994).

At this stage of the proceedings, in a light most favorable to Plaintiff, she can claim that the loss of the Nielsen account resulted in a substantial loss of income, and after the transition, she was relegated to dealing with much smaller businesses, which was, in a sense, a demotion.   She complains that she was not given a "ramp up" to permit her more time to develop new business in her territory.   Additionally, she claims she was being harassed in the workplace by superiors and shunned by other employees, and the loss of Nielsen was a personal embarrassment to her and damaged her reputation in this business community.   Plaintiff contends that HR was not responsive and she had no other choice.   Given the contrary evidence proffered by the Defendant, I find this a close call even at this stage of the case.   However, in a light most favorable to Plaintiff, she  constructively discharged.

As for the fourth element of a *prima facie* case of discrimination, that other, similarly situated employees outside of Plaintiff's protected class were treated more favorably, Plaintiff testified that other BAEs were allowed to keep their national accounts after the restructuring of the business channels.   Specifically, she claims Russ Cuccia, a 50-year-old male; Gary Mariano,

a 47-year-old male; and Colette Harper, a 48-year-old female, were allowed to stay on national accounts when she was losing Nielsen.[9]  *See* (Doc. 44 at 11) (citing Wood Dep. (Doc. 24 at 34, 52, 53)).[10]  While Cuccia, Mariano, and Harper were members of the protected class under the ADEA, all are younger than Plaintiff.  While Harper was a member of Plaintiff's protected class under Title VII, Cuccio and Mariano obviously were not.  Although Defendant makes a strong showing to the contrary, considering the evidence in a light most favorable to Plaintiff, there is some minimal evidence to support her claims of age discrimination and gender discrimination.

Defendant argues that even if Plaintiff demonstrates a *prima facie* case, her age and gender discrimination claims still fail because any adverse employment she suffered was the consequence of a legitimate realignment of the company's business channels in Florida and not the result of any discriminatory animus.  In support, it proffers evidence from Mr. Lanman and Ms. Orr-Lynch who made the decision to realign the business channels and who drew up the new Rules of Engagement, redefining which disciplines would cover which customers after the restructuring.  *See* Lanman Dep. (Doc. 34 at 23-25, 29, 32-33, 35-38); Orr-Lynch Dep. (Doc. 35 at 45-54, 61-71, 77-81, 88-89); (Doc. 24, Exhs. 29, 51, 55); Young Dep. (Doc. 29 at 148).  Here, Defendant has proffered adequate evidence that the adverse employment actions suffered by the Plaintiff were taken for legitimate, nondiscriminatory reasons.

---

[9]These ages reflect these employees' ages as of October 21, 2004.  *See* (Doc. 44 at 6, n.5).

[10]This "evidence" is also disputed by Defendant.  Ms. Orr-Lynch denies that any BAEs were permitted to stay on any national account, and Mr. Young specifically disputes that Gary Mariano and Colette Harper were allowed to service any national accounts after the transition.  According to Mr. Young, none of his reps, except Plaintiff to the extent that she was allowed to continue working on the Nielsen account, were allowed to retain or service a national account.  Young Dep. (Doc. 29 at 149).

Upon this proffer by Defendant, the burden shifts to Plaintiff to demonstrate that the legitimate business reason proffered by Defendant is a pretext for sex or gender discrimination. In this respect, Plaintiff makes no specific argument.  Generally, she insists that despite its claims to the contrary, the Defendant permitted some BAEs to work their national accounts even after the transition.  She also refers to a statement made by Mr. Young just before the transition meeting of October 21, 2004, wherein he purportedly stated to Wood, "Those are pretty pointed shoes for an older woman."  (Doc. 44 at 11) (citing Wood Dep. (Doc. 25 at 179)).  Beyond this one statement, Plaintiff relies heavily on the subjective opinions of Ms. Chevola, *see* (Doc. 44 at 12-13), and her own subjective impressions of age- and gender-based animus by the relevant decision-makers.

Plaintiff does not dispute the facts surrounding the strategic realignment or the fact that she lost the Nielsen account because of that realignment.  The records indicate that she fought hard to keep the Nielsen account before and after she was formally told that it was being taken from her.  Nowhere in her proffered evidence from that period does Plaintiff assert that the decision was based on age or gender discrimination.  While there are a few instances in the proffered business records where Plaintiff made an express complaint that Young, her supervisor, discriminated against women and there are other complaints of males receiving more favorable treatment than she did, no similar complaints were leveled against Ms. Orr-Lynch or Mr. Lanman, the persons who instituted the strategic realignment and who, along with HR representatives, determined that Plaintiff would be transitioned off the Nielsen account.  Mr. Young's comment about Plaintiff's "pointed shoes" lends little to the discussion, since if it was

21

said, it was said after the decision had been made to take Plaintiff off the account, and it is

undisputed that Young was not a decision-maker in that decision.

In any event, even if the new Rules of Engagement for the transition permitted a BAE

to stay on a national account and even if that occurred as Plaintiff claims, the analysis is

unchanged, as all of these persons were above age forty and one of these persons was a female.

If anything, such evidence supports the conclusion that considerations other than age and

gender were the determinative or motivating factors for the decision.  Even if Plaintiff can

establish she suffered an adverse employment action through the taking of the Nielsen account,

she has no sufficient evidence that the realignment and consequent loss of Nielsen was a pretext

for age or gender discrimination.

Upon consideration, even if Plaintiff has established a *prima facie* case of age or

gender discrimination through the taking of the Nielsen account or her constructive discharge,[11]

Plaintiff has failed to rebut the legitimate business reason for Verizon's reassignment of the

Nielsen account.  Therefore, summary judgment is appropriate as to Counts I, III, V, and VII.

### C.

Defendant also seeks summary judgment on Plaintiff's retaliation claims.  By her

Amended Complaint (Doc. 2), Plaintiff alleges that Defendant retaliated against her for

---

[11]The evidence is clear that Plaintiff's constructive discharge claim is driven by the loss of the Nielsen account which, in a light favorable to her, caused her to suffer a significant reduction in income and a loss of prestige that arguably amounted to a demotion.  The other allegations of harassment or favoritism, even if true, was not so severe as to warrant Plaintiff's resignation.  Since Plaintiff fails to present sufficient proof that age or gender motivated the Nielsen decision, Plaintiff's claim of constructive discharge fails as well.

opposing Defendant's discrimination against Ms. Chevola, a women over forty years of age.[12]

Generally, Defendant responds that it took no retaliation against Plaintiff, and instead, the

record supports that when Plaintiff complained about something, the company responded

favorably to her concerns.  It argues that Plaintiff did not engage in protected activity in her

defense of Ms. Chevola, and even if she did, the decision to take her off the Nielsen account had

already been made *before* she engaged in any such protected activity, and thus, there is no

causal connection.  As for the Nielsen account, as set forth above, Defendant urges that the loss

of this account was not an adverse action in the given circumstances where Plaintiff received

extraordinarily favorable treatment during her transition off the account.  Again, Defendant

maintains that Plaintiff has both failed to establish a *prima facie* case of retaliation and to

otherwise rebut its legitimate business reasons for the reassignment of the Nielsen account.

     Plaintiff maintains that she complained of gender discrimination to HR in 2002 and

2003.  Conceding that those complaints are time-barred, she asserts that they nonetheless

provide background evidence for her retaliation claims that are based on the decision on

October 21, 2004, to take the Nielsen account from her.  She maintains that the taking of the

Nielsen account was directly related to her objections to the way Ms. Chevola was being treated

by Ms. O'Donoghue and others.  According to Plaintiff, the evidence supports that Ms. Chevola

--------

[12]In Count II, Plaintiff alleges retaliation under the ADEA for opposing age
discrimination; in Count IV, she alleges retaliation under Title VII for opposing sex
discrimination.  In Count VI, she alleges retaliation under the Florida Civil Rights Act
("FCRA") for opposing age discrimination; and in Count VIII, she alleges retaliation under
the FCRA for opposing sex/gender discrimination.  *See* (Doc. 4).  Previously, this court
dismissed Plaintiff's retaliation claims to the extent that they purported to be based on her
participation in Verizon's internal investigation.  *See* (Docs. 16 at 2; 13 at 16).  Thus,
Plaintiff's retaliation claims are based on her opposition to the allegedly discriminatory
conduct directed against Ms. Chevola, a female over forty years of age.

had complained of gender and age discrimination (and of fraud on the Omega account and others), and she spoke in her behalf even after Mr. Young informed her that she might or might not lose the Nielsen account, a comment she understood as a warning that she should not support Ms. Chevola if she wanted to keep the account.  Given that Plaintiff lost the Nielsen account only one month after she supported Ms. Chevola, Plaintiff urges that the issue of a causal connection between her opposition and the loss of the Nielsen account is a question of fact for the jury.

　　　　To establish a *prima facie* case of retaliation under Title VII, the ADEA, and the FCRA, the Plaintiff must show (1) that she engaged in statutorily protected expression, (2) she suffered an adverse employment action, and (3) the adverse employment action was causally related to her protected activities.  42 U.S.C. § 2000e-3(a); *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).  "Statutorily protected expression" includes internal complaints of sexual harassment to superiors or to a human resources department, as well as complaints filed with the EEOC.  *Pipkins*, 267 F.3d at 1201.  To establish a causal connection, the plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated.  *Bass*, 256 F.3d at 1119; *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) ("The causal link element is construed broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" (quoting *Olmsted*, 141 F.3d at 1460)); *Gupta,* 212 F.3d at 590.  Close temporal proximity between the protected activity and the adverse employment action may be sufficient to show that the two were not wholly unrelated.  *Bass*, 256 F.3d at 1119; *Gupta*, 212 F.3d at

24

590.  If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the

defendant to articulate legitimate reasons for the adverse employment action.  *Johnson*, 234

F.3d at 507.  If the defendant does so, the plaintiff must demonstrate that the reasons the

defendant gave were pretextual.  *Id.*

As discussed above, in a light most favorable to the Plaintiff, the reassignment of the

Nielsen account was an adverse employment action.  In the context of a retaliation claim,

Plaintiff must show that a reasonable employee would have found the challenged action

materially adverse, "which in this context means it well might have 'dissuaded a reasonable

worker from making or supporting a charge of discrimination.'"  *Burlington N. & Santa Fe Ry.*

*Co. v. White*, 126 S. Ct. 2405, 2415 (2006).  Such is arguably the case here.

Plaintiff proffers evidence that she engaged in statutorily protected opposition to sex and

age discrimination to support a *prima facie* case.  In a light most favorable to Plaintiff, Ms.

Chevola made a complaint of continued mistreatment at the hands of Ms. O'Donoghue and

others, which was investigated through the approved company channel.  By Ms. Chevola's

account, the mistreatment amounted to age- and gender-based discrimination.  Upon

investigation, at least part of the harassing conduct by Ms. O'Donoghue was found to have

occurred and was considered unprofessional by Mr. Lucas.[13]  Lucas Dep. (Doc. 32 at 60-61).

Plaintiff proffers evidence that she opposed the mistreatment by supporting Ms. Chevola by

giving a statement to Mr. Lucas.  In a light most favorable to Plaintiff, she did so despite the

---

[13]Her allegations of mistreatment at the hands of Ms. O'Donoghue at a meeting at
Hunter's Green lead Mr. Lucas to counsel O'Donoghue.

veiled threat by Mr. Young that she might lose the Nielsen account as a result.  This is sufficient at this stage of the analysis.

As to the third element, a causal connection between her opposition to the discrimination against Ms. Chevola, I find the matter a much closer call.  Upon careful consideration, I conclude that the short time span between Plaintiff's opposition and the meeting at which she was formally noticed that she was losing the Nielsen account, coupled with her evidence that Mr. Young attempted to discourage her opposition upon pain of losing the Nielsen account, carry the day for the Plaintiff.[14]

As with her discrimination claims, Defendant has proffered as a legitimate business reason for the reassignment of the Nielsen account the organizational restructuring of its Florida business channel.  While I concluded above that Plaintiff offered no sufficient evidence to support that the stated reason for her losing the Nielsen account was a pretext for age or gender discrimination, there are sufficient factual disputes to raise a jury question over whether the taking of the account was in retaliation for Plaintiff's support of Ms. Chevola's claims of

---

[14]As discussed *supra* at 9-10, Defendant argues that Plaintiff knew that she had lost the Nielsen account even before she spoke with Mr. Lucas, and therefore, her opposition could not have lead to the loss of the Nielsen account.  There is evidence to support that the decision was effectively made as of the time the new Rules of Engagement were adopted in May 2004.  Plaintiff's own conduct supports that she was aware that she was likely to lose the account even before the October 2004, meeting.  However, the evidence appears to indicate that Plaintiff was not formally advised that she was losing the account until that meeting.  Both before and after the October meeting, Plaintiff actively pursued keeping the Nielsen account and she proffers that some other BAEs were permitted to hold on to such national accounts even after the realignment.  Given the timing of the October meeting, she may claim that her opposition in support of Ms. Chevola was the motivating cause of the formal notice that she was being transitioned off the Nielsen account.  While the evidence that Plaintiff supported Ms. Chevola's claims of age and gender discrimination (as opposed to general claims of mistreatment) is "thin" as well, I view the evidence sufficient to establish a *prima facie* case.

harassment and discrimination.  Accordingly, summary judgment is not appropriate as to Counts II, IV, VI, and VIII.

D.

In Count IX, Plaintiff raises a similar allegation of retaliation under the Florida Whistleblower Protection Act ("FWPA"), Florida Statutes section 448.102, which prohibits an employer from taking retaliatory personnel action against an employee because the employee has "[o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."  Fla. Stat. § 448.102(3).  More particularly, Plaintiff alleges that she lost the Nielsen account "because she objected to and refused to provide favorable testimony for Defendant in Defendant's investigation to discredit Sandra Chevola's allegations[15] that the Defendant was in violation of law by practicing fraud upon the Omega Insurance account."  Am. Compl. (Doc. 4 at ¶ 80).

A plaintiff alleging a violation of FWPA must establish the same elements of retaliation under Title VII, except that the FWPA requires the plaintiff to prove an actual violation of a law, rule, or regulation in order to succeed.  *Rice-Lamar v. City of Ft. Lauderdale*, 853 So. 2d 1125, 1132 (Fla. Dist. Ct. App. 2003); *Barlow v. Conagra Foods, Inc.*, No. 8:04CV2286T17TGW, 2005 WL 3133474, at *4 (M.D. Fla. Nov. 23 2005) (citing *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945 (11th Cir. 2000); *White v. Purdue Pharma, Inc.*, 39 F.

---

[15]There is little about the alleged fraud in the record.  Ms. Chevola testified that sometime around January 2004, she learned of fraud on the Omega Insurance account, and she later learned about other accounts as well.  Ms. Chevola reported the fraud to supervisors,  and She claims she was harassed because of this.  She spoke with Mr. Lucas about the fraud when he investigated her complaints about Ms. O'Donoghue later in the year.  Chevola Dep. (Doc.  30 at 339-44).

Supp. 1335, 1337-39 (M.D. Fla. 2005)).  The statute defines "law, rule, or regulation" to include "any statute or ordinance or any rule or regulation adopted pursuant to any federal, state, or local statute or ordinance applicable to the employer and pertaining to the business." Fla. Stat. § 448.101(4).

Defendant argues that summary judgment on this count is appropriate because Plaintiff cannot show that she engaged in protected activity by cooperating with Lucas's investigation and providing testimony generally favorable to Ms. Chevola.  By this argument, the undisputed facts are that Plaintiff failed to voice any opposition to the allegedly fraudulent activity on the Omega account.  Furthermore, Defendant argues that Plaintiff has failed to demonstrate that the allegedly fraudulent activations on the Omega account violated any law, rule, or regulation or that the alleged fraud constituted an activity, policy, or practice of the Defendant.  Plaintiff does not address these specific arguments, relying instead on her general argument that she was retaliated against; she comments only that "Young's suggestion that if Wood testified at the Lucas interview favorably to the Company position that it might affect her ability to keep [Nielsen] violates § 448.102(3)."  (Doc. 44 at 20).

Defendant's argument is well-taken.  Plaintiff has failed to proffer evidence of an actual, underlying violation of a law, rule, or regulation as alleged, namely, fraudulent activity on the Omega Insurance account (or any other account) that constituted an activity, policy or practice of Defendant.  Plaintiff herself knew nothing of the alleged fraud apart from rumors she had heard, and she has done nothing to prove even her good faith belief that it was occurring. Wood Dep. (Doc. 26 at 384-95).  Furthermore, it does not appear that she ever spoke in opposition to the fraud.  A review of Mr. Lucas's deposition testimony, his notes from his

28

interview with Plaintiff, and Plaintiff's own testimony about the interview all suggest that while

Plaintiff complained generally about the mistreatment of Ms. Chevola and herself at the hands of

supervisors, there was no discussion about fraud on the Omega account.   *See* Lucas Dep. (Doc.

32 at 37-40, 52-53; Exh. 1); Plaintiff herself makes no claim that she provided any information

about the allegations of fraud on the Omega account, admitting at deposition that she was not

even asked about it.  Wood Dep. (Doc. 26 at 395). Under these circumstances, Plaintiff fails to

proffer sufficient evidence that she objected to, or refused to participate in, any unlawful

activity, policy, or practice of Verizon such that she can pursue a claim under the FWPA.

Accordingly, summary judgment is appropriate as to Count IX.


IV.

For the foregoing reasons, it is RECOMMENDED that the court GRANT in part and

DENY in part Defendant's Motion for Summary Judgment (Doc. 23).  Specifically, I

recommend that court enter summary judgment in Defendant's favor as to Plaintiff's

discrimination claims asserted in Counts I, III, V, and VII and her whistleblower claim raised in

Count IX and deny the motion with respect to Plaintiff's retaliation claims raised in Counts II,

IV, VI, and VIII.

Respectfully submitted on this
21st day of November 2007.


THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; see also Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.

Copies to:
The Honorable James D. Whittemore, United States District Judge
Counsel of Record